7-1149 Halliburton Energy v. M-I LLC. Mr. Manso, good morning to you. Welcome. Good morning, Judge Rochelle. Please proceed. May it please the court. Halliburton submits the following three points this morning. Point one, the independent claims are not indefinite under a proper reading of the law. Point two, it was an error of order to dismiss all of the dependent claims as necessarily indefinite, which the judge did at A-54 and A-74, without consideration for what they add to definiteness, even if the current claims did, argument though, include an indefinite term. Now, on that second point, did you press that point in your brief? The argument that the court, independent of all other errors, should not have disposed of all of the claims as opposed to just the independent claims? I believe that's in our brief, Your Honor. Well, maybe if you could, your colleague, could find it, because I wondered whether you were pressing the dependent claims as opposed to the principal argument, which was based and directed at the independent claims. It wasn't even clear to me how many dependent claims were at issue here. I think it was some one place in the record it said 88, another place it said 82, another place it said all the dependent claims from 1 through 3 and 5, which would have included like 100 and some odd. It's over 80 dependent claims. Well, which ones are they? How would I know? I believe they are in the order of the district court. I think the district court just says the independent claims 1, 2, 3, and 5 and the I looked at, best I could tell, the dependent claims are all the claims are ultimately dependent from 1 through 3 and 5. I cannot say whether there are no claims dependent on claim 4. Well, I looked and I didn't see any. Then I think that the judge held all of the, I'm not sure whether all of the dependent claims are held invalid or just the asserted ones. Well, which were asserted? A long list. Because it's not in the complaint. The complaint just says infringed the patent. Is there a place somewhere in the record that I should look? We can dig that out, Your Honor. I don't have that answer. I thought you were saying that the district court didn't give proper weight to the dependent claims as informing the proper construction of the independent claims. That's what I remember from the brief. There are a variety of points, Your Honor, and since we're on point two already, let me just address that first. Where did you make that argument in your blue book? That's the question. The first question. Page 43. This is very easy to address. If, argue endlessly, there is an independent claim which contains an indefinite term, and there are many dependent claims that are held. Page 23. Moreover, it was erroneous. 23? 23, Your Honor, in our summary of the argument, it was erroneous as a matter of law for the court to also rule indefinite those same dependent claims, but the court differentiated. I see. So this is actually a major issue. In the arguendo, the broad claims have an indefinite term. That doesn't automatically make the dependent claims indefinite, too, and there's no case law cited to support that. Look at Claim 128, just hypothetically. I'm not following your argument. If the limitations added by a dependent claim address the deficiency in the preamble term that's in dispute here, fragile gel, then I could follow your argument, but as I recall, the specific limitations added by the various claims don't address the deficiency or ambiguity of the phrase fragile gel. They address other parameters of the claimed invention. I don't believe that's correct, Your Honor. I believe they do address the specifics of the gel of the drilling fluid. Just for example, Claims 3 and 16, ECDs are less than about 0.5. Claim 6 talks about details of the invertebrate emulsion. Claim 7 talks about thinner. Claim 9 talks about structure. But how does that address the ambiguity of how fragile does a fragile gel have to be to be covered by these claims? They talk about characteristics of the fluid, and you can define a substance by its characteristics, Your Honor. Well, if you do it in a way that is sufficiently definite, that's the issue in the case. That is indeed the issue, but I don't think it's fair to Halliburton for the Court to dismiss all an infringement question instead of a validity question. Where is the judge treating it as an infringement question? Can you cite some part of his ruling that shows that that's what he did, or are you just speculating that that must have been his thought process, or what? The judge did not treat it. He just summarily dismissed them all in his order in the final paragraph and in the judgment order. There was no consideration given to whether those fragile gel drilling fluids, absolutely none, is in his order. Well, of course they do, because that's what makes them a dependent claim, is that they add one or more additional limitations to those that are in the independent claim. But that doesn't seem to address the issue that the added limitations would have to remedy the defect that he found in the phrase fragile gel appearing in all the independent claims in order for your point to be correct, I think. Of course, you're right, but it hasn't been treated by the Court. The judge didn't just dismiss it and assume that since... Yeah, but we can look dependent claim by dependent claim to see if the limitation added in a particular dependent claim resolves ambiguity otherwise evident in the ambiguous word fragile. I don't agree that fragile is ambiguous at the moment, Your Honor, but I agree that you certainly have the... So if we, would you agree that if we look at every dependent claim and make a judgment as to whether the limitation added by such a claim is ambiguous, if we decided it didn't, then we would have to uphold his ruling on all the dependent claims if we agreed with his ruling on the independent claims. Apart from the procedural issue, yes. You know, I wondered about the dependent claims. I didn't see anything in Judge Davis's order about that, which led me to wonder whether the way you had presented it, the parties had presented that question before Judge Davis actually adverted to the dependent claims. Because as I say, I mean, maybe that one sentence on page 23 in the summary of argument is enough to raise that issue here, but it certainly is a fleeting reference to that issue. Did you raise this question of the dependent claims before Judge Davis? I can... This is Judge Davis, isn't it? Yeah. Judge Davis. I can respond to that specifically in my report. All right, that's fine. Now, we have diverted you into point two, which was sort of a fallback argument. Maybe we need to get to point one. Well, point two is very important because it concerns more than 80 claims, Your Honor, but... Some number, but which we don't know. I wasn't suggesting that point two is unimportant. I'm just simply trying to make sure that in available time you adequately treat point one. And the third point of my introduction was that as a respondent to a summary judgment motion, Halliburton was entitled to the benefit of having all reasonable inferences drawn in his favor and all genuine disputed issues of material fact resolved in its favor as stated by this court recently in many cases, but most recently perhaps in Young v. Luminous, 2007. The district court did the opposite here. Well, wait a minute. What were the fact issues on which deference would be due? I'm not sure I see any fact issues on the entire horizon here. It's claim construction. It's a question of looking at language in a preamble and then looking at language elsewhere and then looking at the definition and the summary of the invention and then looking at the preferred embodiments and so forth, as we all do all the time. So I'm looking for the fact issues. The fact issues are listed at page 28 to 29 of the Gregory Charter. There is a multitude of factual issues presented there, and Halliburton submitted evidence on those issues. The judge ruled, or basically dismissed that evidence. We don't think that was proper procedure for a summary judgment motion. Well, that has to do with what a person of ordinary skill in the art would know. Doesn't that happen in almost any context where there's an invalidity argument? And this is, I guess, one of the conundrums of claim construction, but are you contending that every time there's an issue of invalidity as a result of a claim construction and the parties on the target of a summary judgment motion comes up with an expert saying, well, it's not indefinite or there's not a lack of a written description or whatever the particular invalidity argument would be, as long as somebody can find an expert who says that's not a problem, then summary judgment can't be granted? As I pointed out in our reply group, there are times when summary judgment can be granted. For example, in the I-PIXL case, where the issue was reciting a use limitation in an apparatus claim that makes the claim per se indefinite. But if there is credible expert witness testimony on an issue of fact that's inherent in claim construction, I don't see how that can be disposed of on summary judgment. In my opinion, Your Honor, it calls for a plenary hearing. All right, but this is a very large point you're making, I think, because district courts all the time have to construe claims. They go through the marking process, and sometimes as a result of the claim construction, it then creates a situation where a claim, if that claim construction is correct, is indefinite or it's subject to some other type of attack. And what you're saying is that those issues cannot be resolved on summary judgment. That type of issue can't be resolved on summary judgment if the opposing party can find an expert who says, well, that claim construction is wrong. Well, it's only when an expert gives credible testimony as to an issue of fact involved in claim construction. Not all issues in claim construction are issues of fact. For example, there are issues of law, and how would we construe certain claim differentiation issues and things like that. But there are many issues as to how a person of ordinary skill in the art, which I would call the posita, understands the language of the claim in view of the specification. They would certainly be relevant if the ground of invalidation had been written description, because you'd have to combine what was written with what the posita already knows in its head. But where we're talking about whether language is too ambiguous, I don't see that the posita comes into the analysis at all. I thought that virtually every case decided by this court uses the touchstone of the understanding of the posita as to whether the language is understandable and why it is. Well, sure, but in Markman and in the subsequent cases, we in effect require the district judge and later ourselves to construe the meaning of the claims, and hence whether they have clear meaning from the perspective of the ordinary artisan, even though we all know we aren't the ordinary artisan. So it seems that you have to try to identify where you've crossed the Rubicon from linguistic analysis by district or appellate judges and gone into truly factual territory on which only fact witnesses, such as experts, can be helpful. And it's not clear to me that we've crossed that line in this case when it resolves, as far as I can tell, boiling it down to the simplest terms, that to be the fragile gel claimed in this patent, it has to have a certain speed of conversion between solid and liquid, and back again, and it has to have a certain strength when in the solid state to hold up the drill filings, I'll call them, so it's a question of how fast, how strong, and the only clue we get from the patent language is that it's fragile. Well, Your Honor, there are many objective anchors in the claim, and the part two of our proposed definition does not say how strong, it says strong enough to suspend those cuttings. It is almost uniformly done in pharmaceutical cases that you recite a therapeutic amount sufficient to achieve a certain result, and that's what we propose here. It doesn't talk about how high that torque spike has to be in 53, you have to have a fluid that is sufficiently strong so that it will hold the drill cuttings and the weighting materials. How large are drill cuttings? Small drill cuttings are larger. Presumably, small drill cuttings can be held more readily than large ones. That seems logical. And in what density? 10 pounds per 10 linear feet, or 100 pounds per 10 linear feet, or what? Well, you could ask questions of that with regard to every element of every claim, Your Honor. Even if you just call for a lever, you'd say, well, okay, how long is the lever going to be made of it, and so forth. When you say that it has to be strong enough to hold up some unknown quantum and weight of drill bit yield, it's almost the same as saying it has to be adequate. But a claim that the key limitation of which is that the claim to mention has to perform in an adequate manner is, look to me, highly indefinite. Who knows what adequate is? The person with skill in the arts certainly does know, because once you start the drill bit up again, you will have pressure while drilling spikes, you'll have sag, you'll have all kinds of other problems. Those are objectively discernible in the field. Everybody in the field knows this, Your Honor. Let me see if I understand the scope of your claim. And here I'm talking about just, let's say, claim one. Suppose I'm a competitor. I've got your patent in front of me, but I have invented a drilling fluid which, although it has the emulsion base, the thinners, the emulsifiers, and the weighting agents, I gather that's pretty common. Virtually all of them will have those elements, right? That's in the prior art. There's no dispute about that. So I start with the prior art, and then I come up with a very ingenious set of additional ingredients which produce... Different ingredients. Sure, different ingredients, which produce the result that I end up with something that you would call a fragile gel. I haven't made it. I haven't copied your particular commercial embodiment. I've just used the basic prior art elements and then added my own ingredients, and I've got something that works just as well as you claim that your patented invention works. That is to say, it suspends the drill filings. It will also release upon pressure. Do I infringe? Does it exhibit fragile gel behavior? Sure. It is just as good as yours, but it's completely different from your product. But it's just as good as yours because I have a really hot shot chemist on my team who said, when he saw this, I can do that, and I can do it better. That's a Wilson versus Boyden question. Well, is the answer yes or no? Do I infringe? Does it work completely the same way? It has the same result, which is that it produces a fragile gel. Now, it works. I mean, who knows how it works? I don't know how it works. I just know that my chemist threw some things together, and they're quite different from the components in your product, but they produce the same fragile gel function. If they don't include the same elements residing in elements one through four. Oh, no. They include those four elements, but so does a lot of prior art. Other than that, I have added new elements, and they produce the functionality that you have asserted. This is not a closed-end transition, Your Honor. I would say it doesn't infringe. It doesn't infringe. It seems to me, if that's so, then you're very close to just pure functional claiming. In effect, what you've done is equivalent to having a patent on a hybrid car, in which you say the hybrid car consists of a chassis, four tires, an engine, and the capacity to go more than 50 miles on a gallon. And no matter what I do, if I build a hybrid car that has four tires, a chassis, and an engine, and gets more than 50 miles on a gallon, I infringe. Well, that goes back to the Morse case and the Telegraph case, because the Supreme Court said you can't claim electromagnetic energy no matter how it's used. But the question here is, you raised the point, Your Honor. You said, suppose there is a breakthrough, and this is a breakthrough. Halliburton solved a catch-22 problem that was a really difficult problem. But even if you have a breakthrough, as a hybrid car is, you don't get to anticipate the future of everybody else's invention by claiming functionality. In effect, what you've done is you've got, it seems to me, a 112.6 here without the structure. Well, that issue I don't think is raised, Your Honor, but I understand your question. Isn't it the case from your answer that Judge Bryson's gel would infringe these patents that you have claimed not just your invention, but all the future inventions in this field? As a pioneer in the field, I'm entitled to broad coverage. And if the alleged infringer uses a fragile gel-drilling fluid that corresponds to the three parts we've posited as the proposed construction of the claim, and has the four elements listed in the claim, and if it works the same way, we're entitled to that. How can anybody be entitled to that which he didn't invent, but some other guy is going to invent five years later? That just sounds nonsensical to me. I thought we already did invent it, Your Honor. You invented something that achieves that functionality, but I think it's fair to say you didn't invent everything that achieves that functionality. Unless you can demonstrate that everything that achieves that functionality necessarily is the same thing that you invented. I see your point, Your Honor, and I accept it, but... Why is this case different from my hybrid car? You clearly wouldn't get all hybrid cars that have better than 50 miles an hour. We can agree with that, right? Yes, I think I can agree with that. What about at the other end? What about at the prior art end? Suppose that I'm a competitor of Halliburton, and so I go out and I copy a prior art patent formulation, and I get a fragile gel out of that. Then I go out and use it in my derrick at my site, and then you sue me for infringement. And I say, well, wait a minute, you can't do that because I'm merely practicing the prior art. And you say, sure I can, because your gel converts quickly and it holds up the files. That's an excellent validity question, but that's not why we're here today, Your Honor. Well, it may be also a claim-definiteness question, because one would think that claim-definiteness should not only distinguish between what's been invented by the applicant versus all the prior art, but also distinguish over later invention, so that it carves out a floor and a ceiling, so that people practicing the prior art won't be sued for infringement, and people later inventing yet better gels also won't be sued for infringement. But anybody who's copying the gel that your inventors invented would be liable and should be liable. Well, in this case, and I did copy the gel we invented. I mean, you're asking a hypothetical question. It's an excellent question. No, but the question is whether in a case like this, to have a definite claim, you don't need to have a floor and a ceiling. We have, this case is greatly different from data miles. But this case only has a floor. As long as it works this well or better, or way, way better, it seems to be covered by your claims, and that gives me a lot of trouble. Well, I hadn't considered it that way, Your Honor, previously. But it seems to me that what we've done in this case is explain in great depth objective aspects of the invented fluid here. We've given graphs. We've given tables. We've given extensive paragraphs of assertions. Well, no one's complaining, as far as I can tell, about the specification. It's just the claim language, which is what protects, what grants the right to exclude. The complaint is that that language is too vague. No one's saying you didn't invent something good. Nobody's saying you shouldn't get a patent. Nobody's saying the spec was badly written. The only complaint that I'm aware of is that the words chosen by the patent prosecutor are insufficiently clear. The patent office didn't think that, Your Honor. Well, we're not bound by what the patent office inferentially. There was no discussion that I am aware of about claim indefiniteness at the examination level. But even if there had been, the district judge and we on review are not bound by what the patent office did, or there would be no validity litigation at all. Of course you're correct, Your Honor. I didn't mean to assert otherwise. But what I'm merely pointing out is that the patent office did not think that this was indefinite when we raised the point. Moreover, MI uses the very same phrase when it holds out its fluid to competitors, as you'll see from the picture on page 18. But we're not talking about advertising. We're talking about the requirements of the law for claim language. I don't care what they say in ads. We're not the policemen of ads. But we are required to be law enforcers about the minimum requirements of clarity in claiming. That has to do with language. Could I ask you about, you referenced the evidence in the specification. I wonder if you could turn to figure four in the specification. Yes, Your Honor. Now, as I understand it, four of those curves represent the invention or embodiments of the invention and two represent prior art. Is that correct? Yes. Okay. How would I distinguish between the prior art? What about those curves? It distinguishes the prior art from the invention. We don't generally rely on figure four to distinguish the invention, Your Honor. We rely on figure four. There's some discussion of figure four in your brief as being, as demonstrating the aspects of the invention. And I just, it strikes me that those, I couldn't make head or tails of those curves as suggesting a difference in function between the prior art and the invention. Your Honor, you're absolutely right in that with regard to this, this is simply data showing how some of the invented fluids behave under a laboratory test. And these don't indicate whether it's a fragile gel fluid. I see. The question of fragility is really concerned with figure three and the L-shaped curve. We think that the district judge made a tremendous error when he rejected the L-shaped characteristic, which is very objectively anchored and is easy for anyone to see. It's easy to perform this well-known test using a Brookfield viscometer. The judge, however, thought it was subjective and decided on various bases, claim differentiation being one of them, and we think the judge was greatly mistaken about his application offensively of claim differentiation. What's the difference? They all look like they have the same L-shape. They don't, Your Honor. The Acrolade invented is more L-shaped than the… It has a higher peak. Well, the peak is not the point, Your Honor. The peak is, the question is the L-shape. And if you look at the 15.6 SF, that would be the heavyweight petrophy. You will see that it does not decline upon itself. It veers off to the right, and that is why it is not a fragile gel. But the 12.1 looks like it declines right upon itself. Correct, Your Honor. And that's prior art. Why isn't that an L-shape? That is an L-shape, Your Honor. So the prior art and the invention both have L-shaped curves in figure three. And how does it distinguish between the two? Part two of the definition that we propose resolves that. And the question is that it is adequate to suspend weightings and cuttings. And go back to function. And there's ample case law that says you can claim functionally an amount effective to do a certain job. The problem with this is that there is a reason to include the second part. It's not a problem. You better have something other than function, though, in that amount. If I went into the patent office and I said, I hereby claim an antiseptic ointment sufficient to kill 90% of all bacteria, and that's all I have, I don't get any antiseptic ointment that can kill 90% of all bacteria. Probably not, Your Honor. You'd have to look at the specification and see whether it gives you the compositions that achieve that. At that point, you might construe the claim in light of the specification and say that it has to cover what was invented, depending on whether you can find words in the specification to import, so to speak, into the claim. In this case, there are reasons why the patent specification does support reading these features in the fragile gel drilling fluid. Those are that we distinguish the prior art in the specification on those features. I thought the prior art also suspended the cutting. Well, in general, the prior art works in a different way. The prior art uses clays and things like that as viscosity. That's the formulation, not the result. The functionality is the same. The prior art suspended the cutting. Your gel suspends the cutting. In terms of function, there doesn't appear to be any significant difference. That is a validity question, Your Honor. What about the clay? Your claim 1 doesn't have any limitation restricting the clay. If this infringing or accused device had clay in it, I can't believe it. If you've gotten by the validity, you wouldn't be in here arguing that claim 1 doesn't require clay. Look, there are dependent claims that say largely clay-free. It says preferably to have clay. That doesn't mean we don't cover all things that have clay. Right? You'd be making that argument, certainly. If you didn't make it, somebody would. Our position on clay is that claim 1 does not, in its system as verbis, call for no clay. Claim 1 permits an amount of clay. And we believe that there are other claims that say substantially no clay. There's even a claim that says you can add clay as a viscosity. So since claim 1 permits clay to be included, then the definition of fragile gel can't be read to exclude clay. It can't be totally free of clay. The invention here achieves its function without needing to add clay. And that's a great breakthrough. Now, obviously, if somebody wrote a claim that says our invention is this and it has zero clay, and along comes MI that says, OK, we're going to add 10 grams of clay and therefore we're not infringing, well, we don't want that result. And moreover, in the field, clay becomes part of the fluid when you're drilling, because as you're drilling through the earth, you're going to encounter clay. Clay's going to enter the fluid. And nobody would buy a fluid that you have to throw away as soon as you've used it once and hit clay. That would be foolish. So the person of ordinary skill in the art is going to know that a little amount of clay has to enter the fluid anyway. So it would make no sense to construe the claim to be completely devoid of clay. Well, but that's where the defendant claims come in, which talk about substantially free of clay, so that you have a defendant claim that says it has to be substantially free of clay, which suggests that the independent claim doesn't have that requirement. Yes, it raises a presumption, but the presumption is not immutable. It can't make the broad claim broader than the invention, as this part of the case says. This just looks to me like a patent in which claims like four have a great deal of detail in them, and there's various other claims, four wasn't a certain, I guess. Correct. But then at the end, perhaps, the patent drafter decided to get very ambitious and decided to go for the whole tamale and just wrote something which is going to basically anticipate the future. And that was claims one through three and five. I don't think it is fair to fault the claim drafter for doing a conscientious job and claiming a pioneering invention in the broad way. Sometimes when somebody overreaches, it makes the case a lot harder with respect to some of the other claims. This may be such a case. I admit that sometimes it can be, but I don't think this is such a case. I think this is a clear case where the evidence overwhelmingly favors Halliburton. I think there are so many objective anchors in the specification that I am befuddled that the district judge reached this result. Well, let's take claim one and walk me through the objective anchors that would allow the competitor to know whether he's infringing claim one with a prior art gel or with some other gel than what your company invented. Okay. Our proposed construction of fragile gel drilling fluid is set forth, of course, in our blue brief and elsewhere, I think at page eight. And it has three parts. The first part is the gel goes to the fluid state upon extraction of force. The objective anchor there is the definition by the inventor of fragile gel at column two in the beginning of line 27. The second objective anchor there. Wait a second. I don't understand the first one. The first one is the text that says a fragile gel is used herein is a gel that is easily disrupted or thinned. Yeah, yeah, yeah. But then all we do is shift down to the word easily disrupted. How easily? What does it mean? What's objective about saying easily or quickly? Well, you could say the same question about high. And the Supreme Court thought that was fine with regard to the idle process case. There are many cases where you have a proven word improved or about. There are a lot of cases where words of degree have been improved. And here we give a graph. We give a graph that shows a test instrument being used that establishes the transition from the gel state to the fluid state. I don't know how much more definite one could be. Yeah, but the claim isn't limited to the graph. So whatever speed is implied by the L-shaped curves on the graph, that's not the limit of the claim. The claim is that plus any other easily dissolving gel. Well, consider the case that you had with sloppiness space, Xerox. That's not a very clear term, right? And yet the court said, well, this specification isn't crystal clear, but we are still going to sustain that. But your argument was saying there are objective measures, objective criteria, objective means of knowing what gel would infringe and what wouldn't. And so I'm just trying to understand, well, what are those objective measures? And you point to words like easily, and it's hard for me to see how the adverb easily is objective because it has no metric to it. It's an eye of the beholder, it seems. To a person of ordinary skill in the art, it's not. To a person of ordinary skill in the art, I haven't finished, Your Honor. The language concerning Figure 3 is also covered in Column 5, Lines 53 or Column 6, Lines 3. And to a person of skill in the art, when you say fragile gel, they will understand exactly what this means. They will understand that it means that it transitions quickly from the gel. How quickly? Quickly enough to be different from the 15.6 SF, which we say is not using, which is not a fragile gel. So if I have something that's halfway between them, do I infringe or not, or do I just take my chances? If it's an L-shaped curve, then it's a fragile gel. If it's sufficiently far away so that it's not L-shaped, then it's not a fragile gel. When you say not L-shaped, do you mean that on the particular horizontal and vertical axes that are depicted in Figure 3, which of course we could change simply by changing the dimensions, but on that particular one that the top of the line is longer than the side? Because you've just told us that one of the prior arts was an L-shaped curve. So you're saying that being an L-shaped curve isn't enough to make it infringing, right? That doesn't speak to parts 2 and 3 of our construction. You're bouncing back and forth. I'm trying to right now get at part 1 and try to see if there's anything about this L-shaped curve that isn't already encompassed by at least some embodiments already in the prior art. The reason that we call something an L-shaped curve is when it falls back vertically. Which one of the prior art items you said earlier, I think, does. I admit that. I admit that. And that presents a validity question over the prior art, not an indefiniteness question. Now this court has said that when... But you were telling me how I could tell whether my competing drilling fluid would infringe, and you said I could tell by seeing if it has an L-shaped curve. Now I think you're saying that's not going to do it for me. I said you could tell whether it's a fragile gel by that. But if it's a fragile gel, as used here, I infringe. By definition, you're saying fragile gel, which has these additional ingredients which are present in everything, is the mark of infringement. That's not the complete story. That is dismissing parts 2 and 3 of our proposed construction. Our proposed construction has three parts. Part 1 is the fragility aspect. And yes, there is a prior art fluid that exhibits fragile gel behavior, but it's such a lightweight fluid that it's ineffective to do the job of suspending drill cuttings and weighting. It's also not substantially free of clay. Those are clay-based. We'd be happy to talk about validity over the prior art and we were given the chance to do so. The question really is, if I may, not whether an infringer, a potential infringer, can figure out whether he's infringing. The question is whether a person skilled in the art can figure out the scope of the invention. And this Court has explained that in a number of cases. I think Your Honor authored one of them, or two of them. Scope of the claim, really. What has been claimed is the question, not whether something else infringes. They're very close, they're related, I admit. But intellectually, the question is what was invented. What has the inventor said when he was using the statute, when he was fulfilling the statute, that says that the specification shall conclude with one or more claims, particularly pointing out a distinctly claim in the subject matter which the applicant regards as his invention. Well, applicants have great freedom under the statute to claim inventions the way they like. Provided they're sufficiently distinctly claimed. Of course. That's what we're arguing about. I agree. That's what we're trying to understand. How is this a distinct enough description of the scope of the right to exclude, to fairly warn everybody else in this field? So they can take a license or change their behavior or know where they stand vis-a-vis Halliburton's right to exclude. Well, the point about the L-shaped curve provides, all by itself, provides definiteness. Now, that may lead to a validity question of the prior art, but I don't think it's right for the courts to say that there is no measure in this specification that says what fragile gel drilling board means. When you compare this case with data mines, talking about aesthetically pleasing, which is a completely subjective term, and you look at the difference between the disclosures, this is night and day. We have paragraphs and paragraphs of text. We have detailed graphs. Nobody's faulting the disclosure. The disclosure is not an issue. Only the claim language is an issue. I agree that it's a very detailed disclosure. Maybe it's a model disclosure. I don't know, but that doesn't seem to bear on whether the claim language is adequately clear. If I may speak to Part 2. Part 2 of the proposed construction talks about whether the fluid can suspend drill cuttings and weighting materials when at rest. The objective anchors for that are the paragraph in column 2 beginning at line 43. Further, from the distinction drawn between the prior art and the present invention in the specification of column 6, lines 5 to 15. Also, the reference at column 2, lines 56 to 57, which distinguished this over the prior art fluids. Also, the specification uses this to contrast the prior art at column 6, lines 10 to 11. And there are objective criteria of suspending weighting materials routinely used by persons in the field using a mud balance. And that's found, for example, in the appendix at A755. I don't think the question is whether there are techniques for measuring these things. The problem is that the patent drafter chose not to use the metrics that those measurement techniques would support. Well, the patent drafter was confronted with a completely new type of fluid and is struggling to distinguish it or to define it. And yes, this was a difficult problem to get your arms around. But I mean, it seems to me the patent drafter either had to claim the formula, the exact ingredients and the quantities thereof, or claim it in largely functional terms but with some metrics, with some numbers in there. The metric is not a number. And Indrae Morosi and other cases say that inventions have to do with it. You will know a case that is based on numbers from reading the specification. And this is not one of them. There is not a single thing in this specification which says the invention depends on a number. Well, the graph, the peak of the graph in three suggests to me a strength of the gel when it's in the solid form. Yes, Your Honor. That actually does relate to the relevant measure. But you tell us that's not imported into the claim, only the L-shaped part, not the peak at the vertical element of the L. The peak can be varied by any of, depends on the testament exact parameters. And those are readily adjustable. What happens is that you can adjust the height of the peak depending on your test parameters, the speed of the veins and the size and shape of the veins. But what you can't change is the characteristic L-shaped curve. That's the part that endures. That's the characteristic. We've achieved that characteristic using an inverted emulsion without adding substantial amounts of mud for a viscousifier. That's an invention. We claimed that invention. We think we're entitled to that still. All right, let's hear from the other side and we'll restore all your rebuttals. Thank you very much, Your Honor. Thank you. What do you say about the dependent claims? I say the dependent claims all rise and fall with the independent claims for this reason. Every one of the independent claims that were asserted require as the critical limitation that was used to define against the prior art in prosecution history was fragile gel. That limitation is in every one of the dependent claims. Which are? Where would we find a list of the either 82 or 88 or 149 asserted claims? Because everybody talks about the asserted claims and even though I made, I think, a reasonable effort to try to find them, I couldn't find them. For exactly this reason, I wanted to see what was at issue. Your Honor, I could go back and look. I had a copy, but I don't have it right here. There were originally 88 claims asserted. Six claims dropped out. It ended up being 82. Is that found somewhere in the appendix? I'll have to look back to see. Well, if it's not, maybe the parties could let us know where we would find it in the appendix. And if it's not in the appendix, maybe the parties could inform us as to specifically which those claims are that were asserted. Ultimately, the 82. Yes. OK. But the reason the independent claims fall is because what Halliburton is doing is jumping a critical step in the analysis. They're actually confusing the validity analysis with the claim construction analysis. What the claim construction analysis is is trying to put the boundary around the claim. And fragile gel, it's undisputed, is a limitation in every asserted claim. So there has to be a boundary. You have to look at, number one, is it a fragile gel to meet the claim limitation? But take, for example, claim 41. I don't know if this is on the list of 82. But that is a claim that has a great deal of detail in it. I can tell you with certainty claim 41 is not asserted. Well, I wish I'd known that before. I've got a lot of time working my way through it. I apologize, Your Honor. But claims like that, that have a detail beyond the basic language of an invert emulsion, a thinner, or weighting agent, the ones that particularly describe what those thinners or weighting agents or emulsifiers are were not asserted. Judge Davis didn't advert to the defendant claims at all, as far as I could tell, did he? And it certainly didn't appear in the opinion. Was there any other place where the, let me ask the question this way. Was this issue raised? Was this separately, was it argued that regardless of what you say about the independent claims, you ought to uphold the defendant claims? To the best of my recollection, Your Honor, it was not a quick look through the record. I argued this. I don't remember that ever being raised before Judge Davis. All right. And you don't respond to that issue, as I recall, in your red brief, right? I didn't either. Did you not understand that to be part of the appeal? I did not understand that we're raising that issue. I think there is a sentence, if you look at the sentence on 23, that does seem to raise that issue. Would you agree with that? I would say I don't agree that that raises the issue. Had they argued the issue, we would have responded to it already. Right. I mean, there's a separate question, I guess, as to whether one sentence and a summary of argument is enough to preserve the issue for appellate review. But it does seem to be talking about the issue of the dependent claims. Would you agree? I would agree it mentions it. Yeah. But I don't agree it raises the issue. And the reason you think it doesn't raise the issue is that it isn't complete enough discussion, or why? That's correct. There's no argument about it whatsoever. There's no laying out which dependent claims they think survive over the judge's analysis. But the statutory requirement of particularity and distinctly claiming, as United Carbond said, is meant only when the claims clearly distinguish what is claimed from what went before in the art, and clearly circumscribe what is foreclosed from the future. So the first step in this, in determining what fragile is, is to say, where is the boundary of this claim? And once we set the boundary, then we get to the next step where we can say, okay, this is the boundary of what a fragile gel is, and now we know what's inside, what's the prior art, and what's not. And now we can analyze the second step that Mr. Manzo is talking about, saying, is there some limitation? Let's say I had prior art, I knew what a fragile gel is, which I don't, but I had some prior art that had the four basic elements that they say are in all fragile gels. And it was a fragile gel under something we can put our hands on. Then Mr. Manzo might say, but that prior art doesn't have the added limitation, so it's not anticipated or obvious. But that's not part of claim construction. The added elements in the dependent claims don't define fragile gel. They might define some additional element in an anticipation or obviousness analysis, but they don't define fragile gel. And the reason fragile gel is much more problematic than Mr. Manzo pointed out, Mr. Manzo said several times this is a pioneering invention. Let me see if I understand your argument on this. You're saying that, well, the word, the fact that the term fragile gel is included in every one of the claims, including the dependent claims, is in itself enough to render all of those claims indefinite. That's correct. Now suppose one of the claims said, a fragile gel consisting of the following, that it gave the exact chemical formula of the invention, one of the embodiments of the invention, the exact formula. That wouldn't be indefinite, would it, by virtue of including the words a fragile gel consisting of? I think it would be in this case where the patent office was told the distinguishing feature from the prior art is the fragile gel. But I'm talking about one of the dependent claims which, as to which you couldn't be more specific as to what is claimed. You don't really think that would be indefinite, right? It's just the word fragile gel there describes its function. That's fine. But the scope of the claim is going to be limited to that exact chemical compound. If this was just a preamble term, I would agree with you. If it was just a preamble term, I would think that was right. But in determining either infringement or anticipation or obviousness, you're going to have to meet all the limitations of the claim. And they've said fragile gel is a limitation. How do I prove that that limitation is in the prior art, or that I don't infringe? Even with all those elements laid out, that element still has to be met. And there is no way to put a boundary around that element. So I think if you look at Claim 4, which says the drilling fluid comprises and then lays out the specific ingredients as you're talking about, I don't think that claim is indefinite. The point on this, too, I want to point out that the Henry Moore, Henry Moore is a CCPA case from 1971, deals with this issue that they've raised about not looking at the prior art. And it specifically says, the definiteness of the language employed must be analyzed not in a vacuum, but always in light of the teachings of the prior art and of the particular application disclosure as it would be interpreted by one possessing the ordinary level of skill important in art. And then it has a footnote that says, it is important here to understand that under this analysis, claims which on first reading, in a vacuum if you will, appear indefinite may upon a reading of the specification disclosure or prior art teachings become quite definite. It may be less obvious that this rule also applies in the reverse, making an otherwise definite claim take on an unreasonable degree of uncertainty. And I think that is actually what would happen in the case that you were just discussing. If it said a fragile gel having these specific elements, you might look at that claim in a vacuum and say, yes, all of those elements are very well defined and very specific, but what is the fragile gel since that's an element? And they said in the prior art these fragile gels existed. In fact, one of the points that Mr. Moore made and Halliburton has repeatedly made in this appeal, which they didn't make in the court below, was this catch-22 idea was not really raised in the court below. And they've said that the catch-22 that this invention saw was prior art gels might have been strong and sufficient to score cutting, or they might have broken easily, but they couldn't do both. And the invention here is doing both. Their expert said on page 878, which was quoted in a red brief, unfortunately the meaning of this term, fragile gel is what he's talking about, as used over the years has not always been consistent. Some have used the term to describe the buildup of sufficient gel strengths, while others have used it to describe the quick and easy breaking of the gel, or both. So their expert said in the prior art it was used to describe both features, drilling clues that have both features of what they're claiming a fragile gel is. That's what makes it impossible to put any definition on fragile gel. That's what Judge Davis meant. Figure 3, I was amazed to hear counsel say that it is an L-shape, if it's an L-shape it's a fragile gel, because prior to that he said, yes, there is an L-shape, the 12.1 SF. So figure 3 can't be any kind of objective anchor, if it shows, as counsel just admitted, that the prior art exhibited fragile gel characteristics. And then he distinguished it by saying, well, but the 12.1 is lightweight. Well, I'd challenge him to look in the claims and find anywhere where lightweight is in any of the claims that were asserted. It's not. There are no objective anchors for this, even the things that they were talking about like low mud losses and no pressure spikes. The evidence before Judge Davis was that many things besides the drilling fluid impact whether there are low mud losses or low pressure spikes, the size of the well, the type of thing you're drilling through, what type of rock, what type of additives. The evidence before the court was that every one of these drilling fluids, there are numerous additives that are in the field added and that those change the characteristic. None of those things are things that are in the claim. So these objective anchors are not real at all, because they depend from well to well and from job to job. And that's why all of the figures in this patent, while they're very detailed and they do propose to show some analysis, these are analysis of one Halliburton fluid, this acrylate fluid, against one other Halliburton fluid, the SF fluid. And they refer to how these things show the prior art. Well, they don't show the prior art. They show a test in one well or one fluid for Halliburton versus one of Halliburton's other fluids. And that's not enough to give an objective anchor either. Counsel also said it has to be quicker than the SF. And I want to point out one other thing before I get off on Figure 3, is that there's a real problem with Figure 3 in that Figure 3 says that the spec, when it talks about a fragile gel as used herein means, it says a fragile gel as used herein is a gel that is easily disrupted or thinned, which means it breaks easily. If you look at Figure 3, in particular the two acrylate curves which have the higher peak, that's the gel strength. And the vertical axis of the graph is percent torque. And what you have here is a cup of drilling fluid with a paddle in it. And there's a period of rest. That's where before the 70, 80 minutes you see the curve is down at the bottom. So the paddle is not spinning. The gels are forming. And then at 70, 80 minutes they start the paddle rotating. And the measure on the left, the vertical axis, is the amount of torque that it takes to break the gel. Well, if the amount of torque, the percent of full torque, is much higher for the fluids of the invention than it is for the fluids of the prior art. So even though the spec says the fragile gel is one that breaks more easily than the prior art, Figure 3 shows it takes more torque to break the fragile gels than the prior art. The prior art breaks more easily because the 12.1 SFF goes much to a lower vertical height. So it takes less force. And all that really shows is the time is even. But it doesn't go to break easily. So there's a big distinction between Figure 3 and what they're claiming is the definition. What do you say about the reference at column 2, lines 51 through 57, to the no initial appreciable, well, at the time of conversion back into the liquid form, no initial appreciable or noticeable pressure spike is observed with pressure while drilling equipment or instruments, as opposed to the prior art fluids that show a pressure spike? Again, I think that runs counter to what you see in Figure 3. Figure 3 shows it would take much more pressure to break the gel of the invention than of the prior art. But again, it's... Well, setting aside any possible inconsistency with Figure 3, how about that as a metric? It can't be a metric because, again, what the testimony was, and what Halliburton has admitted, is that each well is different. And the things that will make a pressure spike in one well depend on the size of the well, the geology of the well, how fast you turn on the pumps, that might make a pressure spike, numerous things. Well, but controlling for all of those things, would you be more likely to get a spike with the... I mean, if you say, you know, controlling for everything else, I define a fragile gel as one in which we will not be as likely to get a spike as with a prior art fluid. I don't know how you could make that distinction because you'd have to figure out how likely was it to get a pressure spike in the prior art fluids, and how much of a pressure spike. I think the blue brief includes at least one diagram that shows a distinction. Perhaps it's in the gray brief. It's in one of the briefs. You know the diagram I'm talking about, I think. I do. It talks about the pressure spike. That diagram that you're talking about? Yeah, it's on 19. No, no, that's not it. It's not the one on 19. It's on, well, it may be in the gray brief. Let's see. Well, in any event, you know the one I'm talking about. 12 and 19 of the blue brief are the areas we're looking at. Oh, yes. It's on top of 12. That's right. There's the spike and the claim to invention, no spike. I'll point out a few things about that. Number one, Halliburton, this is a slide that they use in the tutorial to judge data. This is not part of the record. This is not in the patent. This is not even something one of a skill in the art or a person reading the patent could say, okay, there's my objective point because that's not part of the patent. And so you can't rely on that. Where did those two printouts come from? Were those just created by Halliburton? Created by Halliburton to argue in the claim construction or in the tutorial before the claim construction. They aren't found in the record? They are not in the record. And I will point to you two things. At age 1261, and this was before the district court, is the deposition of Ronald Clark, who is Halliburton's expert. He was asked, when you say appreciable pressure spike, is there such a thing as a non-appreciable pressure spike or are you saying no spike at all? He answered, well, it's so hard to be definite when it comes to drilling because all kinds of things happen. But a pressure spike that's large enough to cause a problem on the rig which may result in loss of fluid is certainly something you wish to avoid. So that's our standard for no appreciable pressure spike. Is it something that's large enough to cause a problem on the rig? And that was consistent with the deposition testimony of Don Sims, one of the named inventors, and I'm reading from A1322. He was asked, how much of a pressure spike is needed to be appreciable? He answered, anything that impedes the drilling operation, i.e. too much loss that impedes the drilling operation. And then there was the start of another question, do you know what? And he answered, or less, you know, at least less than the prior art fluid. Question, and what was the level of pressure spike that was known in the prior art drilling fluids? Answer, I have no idea since I'm not a PWD guy. Question, how would a competitor of Halliburton know what's an appreciable pressure spike and what's not in terms of this patent? And this is one of the named inventors. He answered, he would need to, well, that's a good question. I guess he would need to go and look at what he's had experienced with regards to pressure spikes before with his fluid or other fluids and compare it to this fluid described in the A1322. How would he compare the pressure spikes described in the A1322? Does that, again, go back to the Brookfield graph? He answered, no. Question, it goes back to actual field data, the pressure while drilling data from the field. He answered, yes. Question was, doesn't the pressure while drilling measurement depend on a lot of other things than just the composition of the fluid, for example, the size of hole? Oh, yeah. Question, the formation being drilled through? Yes. Now, what pages were you reading from? A1322 to A1324. Right, okay, yeah. And so one of the inventors admitted that appreciable pressure spike is something that doesn't cause a problem and it depends on many other things besides the drilling fluid. So I don't think that can be an objective anchor at all. Anything further? No. Thank you, sir. Mr. Manto, you have up to five minutes. If I may, Your Honor, Henry Moore is not a case that's been cited in the briefing. I'm not prepared to speak to that case today. Second, there's a question of what's in the record and what is not in the record. I think the picture at page 12 may have come from the tutorial. As we say, right in my brief, it comes from the tutorial. But if you look at page 19, Your Honors, that shows the defendant's own brochure, and that's in the record at appendix 1081. And what you see there, by virtue of using the invention, is that you see no pressure spike. Now, I also want to clarify that a pressure spike is not what is being addressed in Figure 3. Figure 3 doesn't show pressure spikes. Figure 3 shows torque readings, and I believe that the interpretation given by defendants of Figure 3 is a little mixed up. The defense is saying the peak is higher in Figure 3. The point, though, is yes, the peak is higher, and the time required to break those gels is zero. So more gels are breaking more quickly. That's the invention here. They go up to a high point, and then they come down upon themselves. That's the feature. They come down, and then they go off to the right. That's the fragile gel aspect. What is it that causes the torque to be registered at a higher rather than a lower level? The degree to which the fluid... The speed of the veins? Is that what we're talking about, in the Brookfield machine, as they go around? I'm not sure I understand your honest question. It probably doesn't make any sense, because I'm not sure I understand the machine. This is like making a milkshake. The height of the curve is adjustable by varying the parameters of your machine. By turning the machine up to a higher and higher speed, right? A higher and higher speed or the size of the vein. You can vary it any way you want. But if you pick constant conditions and you compare the prior art to the invented fluid, you still get the L-shaped curve, and you're still going to see that the invention goes... Let me ask the question this way. There is a data point at 70 minutes roughly and 45 on the Brookfield torque scale for one of the inventions. What does that represent? What does that tell us is happening at that moment during the moments immediately before and after? That's a diamond? Right, right. That tells that Accolade in the 12.65 weight reached a high torque requirement. What does that mean? It means that it gelled to a high degree and that more torque was needed to break it, but it broke instantly. As you can see, the current only went up, and then it came back down along the same line. All those gels were being broken instantaneously. So it became a more glutinous gel. And then it became a fluid instantly. Okay. And that's because when you look to see where does it head off to the right, it's around 10% of Brookfield torque. That's the invention in your art. It goes up and it comes down on itself. And when you look at the other one, the 15.6 Petrofree, 15.6 SF, which would be the Xs, you'll see that it goes up. This is the far right peak. You'll see that it goes up only to about 20, and then it comes down and veers off to the right. It doesn't come down upon itself. That's why it's not L-shaped. This is all explained in column 5 here. Now, I also want to point out that we discuss pressure spikes in column 2 and column 5. We distinguish the pressure spikes that you overcome by using this invention. By virtue of the gel breaking right away, you don't have a pressure spike when you start your drill again. And if you look at the curve in MI's own brochure that we produced on page 19 of our brief, you'll see that there's no spike. And if you want to compare that to the prior art, you'll find an example of pressure spikes in the prior art at page A763, using prior art fluid. There are spikes all over the place because the prior art doesn't allow you to avoid those spikes. What page is that you were reading from? A763 shows the graph. This is in the expert report of one of our experts, Dr. Clark. Any closing point? I'm sorry, I didn't hear you. Any final point? Did you cover your points? Yes. I do have two further points. Quickly. In the Exxon case, this court held that you can... You don't need mathematical precision. You can determine, in that case, the substantial absence of slug flow by the effect on something else. In that case, it was the effect on reactor efficiency. This is just like that. And finally, close cases have to be resolved in favor of the patentee on indefiniteness. You mean the presumption of validity of that? Yes. Okay. The Exxon case says that. Any close questions of indefiniteness are to be resolved in favor of the patentee. All right. We thank both counsel. We'll take the appeal under advisory. Thank you, Your Honors.